UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

VALOREE LYNN PEMBROKE,

           Plaintiff,

   -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

           Defendant.

**DECISION and ORDER
No. 6:13-CV-6185(MAT)**

───────────────────────────────

## I.  Introduction

Valoree Lynn Pembroke ("Plaintiff" or "Pembroke"), represented by counsel, brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Acting Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

Plaintiff protectively filed an application for DIB on November 17, 2008, alleging disability commencing January 2, 2004. T.92-98.[1] This application was denied on February 5, 2009, T.39,

---

[1] Numerals preceded by "T." refer to pages in the transcript of the administrative record, submitted by Defendant as a separately bound exhibit.

41-44. Plaintiff also filed an application for supplemental security income ("SSI") under Title XVI on December 31, 2009. On February 19, 2010, Plaintiff appeared, with her attorney for a hearing before Administrative Law Judge John P. Costello ("the ALJ"). Vocational expert Julie A. Andrews also testified. See T.765-99. On March 19, 2010, the ALJ issued a decision finding that Plaintiff was not disabled. T.385-99. Plaintiff requested review by the Appeals Council, T.400-04, which vacated the hearing on November 24, 2010, and remanded the case to the ALJ for further administrative proceedings. T.407-10.

At the supplemental hearing held on February 21, 2012, see T.800-35, Plaintiff appeared with her attorney and testified, and the ALJ also took testimony from the VE. On March 22, 2012, the ALJ issued another unfavorable decision. T.18-31. On February 14, 2013, the Appeals Council denied Plaintiff's request for review of the ALJ's decision on the Title II claim for DIB, and dismissed Plaintiff's request for review of the ALJ's decision on the Title XVI claim for SSI. T.9-19. The ALJ's decision thus became the Commissioner's final decision.

Plaintiff then commenced the instant action. Only the following time-period is at issue here: January 2, 2004, Plaintiff's alleged onset date of disability, through March 31, 2007, the date she was last insured for DIB.

III. **The Administrative Record**

   A.   **Medical Evidence Prior to March 31, 2007, the Date Last Insured**

On February 24, 2003, Plaintiff was seen by her primary care physician, Steven Howard, M.D., complaining of dizziness related to her benign positional vertigo that had recently become more persistent. Dr. Howard refilled her meclizine prescription. T.244. On March 6, 2003, Plaintiff again saw Dr. Howard, reporting that she had woken up the day before with "severe" vertigo symptoms and nausea, felling as if she "just got off an amusement park ride". T.243. The results of the brain MRI ordered by Dr. Howard showed hypertrophy of the inferior turbinate of the nasal cavity on the left side with hyperintense T2 signal, indicating chronic inflammatory change. T.519.

Plaintiff returned to see Dr. Howard on March 25, 2004, for reevaluation of her vertigo symptoms. Dr. Howard continued her meclizine prescription, and referred her to otorhinolaryngologist James Hadley, M.D. T.242.  On September 16, 2004, Plaintiff saw Dr. Howard for her vertigo, knee pain, and depression. She reported recurrences of her vertigo symptoms 3 to 4 times per week which prevented her from driving. Plaintiff explained she had been experiencing depression, mood swings, and suicidal ideation. T.239. Plaintiff expressed an interest in counseling for her depression and anxiety. Id.

Plaintiff saw Paul Dutcher, Jr., M.D. on October 12, 2004, regarding her dizziness and migraine headaches. Plaintiff was referred to Dr. Dutcher, a specialist in otolaryngology, in October 2004, for her vertigo and as-yet undiagnosed migraine headaches. She reported headaches occurring, sometimes in conjunction with her vertigo, that caused her to have throbbing pain in her head and to feel disoriented, foggy and have difficulties talking, remembering, and walking. T.479. In April 2004, these episodes increased in frequency to 2 to 3 times per week, sometimes once per day. Id. She generally would take meclizine and fall asleep for several hours. There was some improvement, but then in October 2004, they began increasing again. Id. Dr. Dutcher opined that the dizziness was not otologic; with the association of the headaches, it possibly represented a migraine area. T.480. Accordingly, Dr. Dutcher suggested proceeding with a neurology evaluation. T.480.

On November 16, 2004, Plaintiff returned to see Dr. Howard for her depression, knee pain, and vertigo. She reported a decrease in her depression but an increase in anxiety symptoms, along with feelings of jitteriness when taking fluoxetine. She had some improvements with regard to her knees as well as with her vertigo. However, she still was feeling "a little bit unsteady." T.502.

Following Dr. Dutcher's suggestion of a neurological work-up, Plaintiff was seen by neurologists Anthony Maroldo, M.D. and Curtis G. Benesch, M.D. on December 8, 2004. She was having dizziness,

-4-

nausea, disorientation, and difficulty thinking and speaking. T.601. She related that over the past six months, her vertigo episodes have been accompanied by head pain, starting bitemporally and then becoming frontal in her eyes. The headaches "feel like someone digging" and cause photophobia and phonophobia. T.601. The headache pain had, at that point, become the focal feature of the vertigo spells, which were occurring on an almost-daily basis. T.601. The neurological examination was essentially normal except for a slight physiologic tremor in both hands. Drs. Maroldo and Benesch diagnosed Plaintiff with migraine headaches. T.602. They recommended she start Inderal LA and also prescribed Imitrex and Phenorgan. T.601-03.

Plaintiff saw Steven Dina, M.D., a consultative examiner for the Social Security Administration ("the SSA"), on December 14, 2004. She indicated to Dr. Dina that her chief complaints were vertigo, depression, anxiety, and knee pain. T.215. Her current medications were listed as the following: Meclizine 25 mg; Fluoxetine 20 mg; Imitrex 25 mg; and Inderal 80 mg. T.215. On examination, Plaintiff could squat to 50% of normal. An X-ray of the right knee showed slight narrowing of the medial side of the joint. T.217. Dr. Dina assessed Plaintiff's prognosis as "fair", noting that she has "mild limitations" with regard to her knees and should avoid activities with repetitive bending, squatting,

kneeling and stair climbing. With regard to her vertigo, Dr. Dina advised her to avoid heights and rotational movements. T.217.

On February 1, 2005, Madan Mohan, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") at the SSA's request. After reviewing the medical record, Dr. Mohan indicated that Plaintiff has an affective disorder and anxiety-related disorder. T.187. He found that she was moderately limited with regard to maintaining social functioning; mildly limited with regard to activities of daily living; and mildly limited in her ability to maintain concentration, persistence or pace. T.197. Dr. Mohan also completed a mental residual functional capacity assessment on the same day and indicated that Plaintiff was moderately limited in her abilities to do the following: perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the

work setting; and to set realistic goals or make plans independently of others. See T.201-03.

Plaintiff returned to see Dr. Howard on February 9, 2005. Despite starting on Inderal LA, Plaintiff was still experiencing migraine episodes twice weekly, although they were much less severe. Dr. Howard recommended she continue with fluoxetine for her depressive symptoms. T.620.

On March 23, 2005, Plaintiff returned to see Dr. Maroldo regarding her migraine headaches. She was taking Imitrex (50 mg) 3 times a week as a headache-abortive agent. T.206. Dr. Maroldo indicated that she presented with a "quite depressed" affect. Examination revealed mild bilateral postural hand tremors. He made no changes to her medications, but noted that if her cognitive problems persisted, he would consider switching her gabapentin to another agent such as propanolol, to try to reduce the cognitive side-effects. T.206-07.

On April 13, 2005, Plaintiff saw Dr. Howard for her depression. Since her last appointment, her fluoxetine dosage was increased and she had begun monthly counseling sessions. She reported less frequent migraines and was working on losing weight and exercising. T.503.

On May 9, 2005, Plaintiff was admitted to the hospital following a car accident. Based on her reports of pains in her cervical and lumbar spine and in her right knee, she underwent

X-rays of the cervical and lumbar spine and of the right knee with normal results. T.550-52. She was discharged later that day, on Naprosyn for pain. T.566.

Dr. Howard saw Plaintiff on July 15, 2005. She reported elevated blood pressure, for which Dr. Howard suggested therapeutic lifestyle changes and a renal artery ultrasound to rule out fibromuscular dysplasia. T.504.

On July 20, 2005, Plaintiff returned to see Dr. Maroldo for her migraines. She had experienced 2 migraine headaches once every 2 weeks since her last visit, as well as "smaller" headaches which occurred 3 to 4 times a week. She also reported tingling in both arms which radiated into her neck; cold sweats; and weakness in her legs, hands, and back. T.606. These symptoms would persist 1 to 2 hours after the headache resolved. Examination revealed a bilateral enhanced physiologic hand tremor as well as symptoms of "significant depression". T.607. Dr. Maraldo recommended she continue her medications. T.607.

On October 21, 2005, Plaintiff saw Dr. Howard reporting some improvement in her symptoms. Dr. Howard again recommended a renal artery ultrasound. In light of her menstrual irregularities, Dr. Howard thought she might have polycystic ovarian syndrome. T.624. Plaintiff underwent an ultrasound of the abdominal and pelvic areas and of the retroperitoneal organs on December 28, 2005, which revealed no evidence of renal artery stenosis. T.283.

She returned to see Dr. Howard on January 27, 2006, with concerns of increased irritability following a decrease in her fluoxetine dosage. Dr. Howard recommended she remain at three tablets, daily. She was having about 2 major migraines per month. T.505.

Plaintiff saw Dr. Maroldo on April 12, 2006, with a recent increase in migraine frequency. She was having migraines at least 2 times per week and was taking Imitrex at the onset of the headaches. T.608. It was providing good abortive relief, but caused her to fall asleep. Dr. Maraldo also noted that she had significant depression which appeared to be under-treated. T.609. Dr. Maraldo recommended increasing her Neurontin (gabapentin) dosage by 300 mg and continuing with Imitrex and Phenorgan as needed. T.609.

On May 15, 2006, Plaintiff saw Dr. Howard in follow-up for her depression and migraines, which had increased in frequency to twice daily. T.231.

On June 12, 2006, Plaintiff saw Anne Moss, M.D. at Neurology Associates of Rochester for in regards to her migraines, which had increased in frequency. T.309. Plaintiff was taking Imitrex 4 times per week due to recurrence of acute migraines. Dr. Moss started Plaintiff on Topamax to help manage her headaches, and planned to taper her off gabapentin. T.310.

Plaintiff returned to see Dr. Howard on July 27, 2006, who recommended that she continue to see her neurologist and that she

increase her fluoxetine to 80 mg in light of her increased stress levels. T.230. She had tapered off gabapentin and was only taking Topamax.

Plaintiff was admitted to Rochester General Hospital on August 17, 2006, reporting speech problems that had lasted 24 hours. T.569-79. She was diagnosed with dysarthria. T.573. In follow-up, Dr. Howard found "pronounced dysarthria" without evidence of any receptive language problems. However, Plaintiff was "unable to speak any words without taking time to concentrate" and had some stuttering. T.229. Dr. Howard suspected a possible conversion disorder. T.229. A CT scan was conducted on Plaintiff's brain which revealed normal readings, except for minimal right ethmoid sinus disease. T.280. A brain MRI revealed no abnormalities. T.282.

Plaintiff returned to see Dr. Moss on September 11, 2006, reporting some improvements with her headaches since beginning Topamax, but some anxiety-induced speech difficulties. Dr. Moss recommended she see her therapist soon. T.307.

On September 18, 2006, Plaintiff was seen by Dr. Howard with regard to her migraine headaches, language disturbances, and ongoing depression. Plaintiff continued to have speech disturbances, which Dr. Howard believed were stress-related. Plaintiff indicated she would pursue counseling. T.227.

Plaintiff was seen by Valarie Cole, Ph.D. on October 18, 2006 with regard to her depression and anxiety. Dr. Cole assessed

Plaintiff to have major depressive disorder, migraine headaches, damaged knees, and issues stemming from family conflicts and unemployment. The day before the appointment, Plaintiff had tried to commit suicide by slitting her wrists with a razor, but had been stopped by her husband. She had also tried to commit suicide in the same manner when she was a teenager. Dr. Cole established a treatment plan for Plaintiff which included weekly supportive psychotherapy, to teach appropriate coping strategies for stress, and to restructure Plaintiff's faulty cognitions that were leading to depression. T.289-90. Plaintiff saw Dr. Cole 21 times between the dates of October 23, 2006, and May 8, 2008. T.291-96. Plaintiff had to reschedule a number of visits due to migraine headaches on the dates of November 14, 2006; January 8, 2007; February 28, 2008; and May 1, 2008. T.291, 293, 296. Plaintiff told Dr. Cole on March 7, 2007, that her migraine headaches were occurring 2 to 3 times per week. T.294.

Plaintiff saw Dr. Howard on December 11, 2006, reporting that she had been seeing her counselor regularly and was working on family issues.

On March 15, 2007, Plaintiff saw Dr. Howard, who diagnosed her with viral gastroenteritis, depressive disorder, stable migraine headaches and elevated blood pressure. T.225.

**B.    Medical Records After March 31, 2007**

The Court incorporates by reference the summary of the medical evidence following Plaintiff's date last insured as set forth in the parties' memoranda of law.

**C.    Non-Medical Evidence and Plaintiff's Testimony**

On January 6, 2009, Plaintiff completed a report with regard to her functioning at the request of the Social Security Administration, indicating that she wakes up in the middle of the night with migraine headaches and that lack of sleep makes the headaches worse. She stated that she was unable to shower every day because she is very unsteady on her feet. T.150. With regard to household chores and yard work she indicated that "most of the house work exhausts me, and the smells of the cleaners triggers [her] headaches." Additionally, she stated that she does not drive because her "migraines hit in split seconds"; she has "almost gotten into accidents due to the confusion" and has been stranded on occasion due to her headaches. T.152. She indicated that she loses balance easily when standing or climbing stairs; both knees hurt when kneeling or squatting; she has tendonitis in her hands; she is sensitive to light; and ver sensitive to sounds. T.154. Plaintiff described her headaches as producing "throbbing, pounding, stabbing" sensations which spread down to her neck. They occur 2 to 3 times per week, and have only increased in intensity over time. T.157-58. Plaintiff stated she took Imitrex, 50 mg as

needed; if worked, it would last for up to 2 hours but included side effects (drowsiness; wooziness; and rebound headaches). T.158.

At the first hearing, Plaintiff testified that her migraine headaches occur 3 to 4 times per week and that "sometimes they can last a couple hours, sometimes [she is] down for a full day." T.776. When asked by the ALJ if she could drive a car during these headaches, Plaintiff replied, "No. I actually tried once and I also rear-ended another car." T.777. She added that she has "severe light sensitivity", gets "dizzy", and is "sensitive" to sounds and smells. T.788. She reported that she also has arthritis in her hands, back, and knees. T.777. She cannot hold onto or grip objects and can only lift a gallon jug of water that is half-full. T.778. She cannot sit for more than 20 minutes and she cannot stand for more than 10 or 15 minutes without her back or her knees hurting. T.779. Plaintiff testified that she suffers from depression, which is somewhat alleviated by Fluoxetine; and anxiety in the form of panic attacks, which occur "maybe a couple times a month" and last about 30 minutes. T.780-81. She described her panic attacks stating "I have trouble breathing. I start crying. I, I, I have trouble talking. My husband has told me I'll actually close off where he can't get me to respond to him." T.781.

At the second hearing, Plaintiff testified that between the years of 2004 and 2007, her headaches varied in severity and described her pain levels on a scale of 1 to 10, as follows: "They

-13-

would start out sometimes at a four and kind of gradually ease up into a seven or an eight and there would be times when it would almost feel like being hit in the head with a rock and it would just automatically be a nine or a ten." T.818.

## IV.  General Legal Principles

### A.    Eligibility Standards for DIB

In order to be entitled to DIB, a claimant must demonstrate that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment, or combination of impairments, which has lasted, or can be expected to last, for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(l)(A). A disabling physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). DIB are unavailable unless the claimant was disabled at a time when she met the insured status requirements of 42 U.S.C. § 423(c), 20 C.F.R. §§ 404.130, 404.315(a).

The five-step sequential evaluation for adjudicating disability claims is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The claimant bears the burden of proof at steps 1 through 4, at which point there is a limited burden-shift to the Commissioner to demonstrate that there is other work in the

national economy that the claimant can perform. <u>Curry v. Apfel</u>, 209 F.3d 117, 122-23 (2d Cir. 2000).

### B.    Standard of Review

Under the Act, the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, a court will set aside the "decision only where it is based upon legal error or is not supported by substantial evidence." <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984).

A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987); <u>see also</u> <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998).

### V.    The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity during the period at issue and had the following "severe" impairments: migraine headaches; vertigo with migraines; depression; and obesity. T.23. However, the ALJ found, none of these impairments, considered singly or in combination, met or

medically equally any listed impairment. At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and determined that she could

> [p]erform light work as defined in 20 CFR 404.1567(b) with the following limitations: avoid brightly lit work settings with bright constant overhead lighting; she can perform frequent but not constant fingering and handling; she is limited to low stress work due to depression and headaches, low stress being defined as work involving decision making.

T.25.

Finding that she could not perform her past relevant work, the ALJ proceeded to step five, where he found that Plaintiff was capable of other work in the national economy, including such representative occupations as a "housekeeping cleaner" or "counter clerk". T.30.

## VI. Plaintiff's Contention

Plaintiff's sole argument in support of her motion is that the ALJ erred in dismissing the 2009 medical source statement of treating neurologist Dr. Moss dated May 13, 2009, without recontacting Dr. Moss to determine whether it was a retrospective opinion, applicable to the time-period at issue (January 2, 2004, through March 31, 2007).

### A. General Legal Principles

"The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant. Green–Younger v. Barnhart, 335 F.3d 99,

106 (2d Cir. 2003). Pursuant to the treating physician rule, an ALJ is required to give "controlling weight" to the medical opinion of a claimant's treating physician regarding the "nature and severity" of her impairments, if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999) ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."). The law is clear in this Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003). "[T]he fact that a treating physician did not have that status at the time referenced in a retrospective opinion does not mean that the opinion should not be given some, or even significant weight." Monette, 269 F. App'x at 113; see also Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (noting that although the subsequent treating physician "did not treat the appellant during the relevant period . . . his opinion is still entitled to significant weight"); Campbell v. Astrue, 596 F. Supp.2d 446, 452 (D. Conn. 2009) (noting that a "retrospective medical diagnosis by a subsequent treating physician is entitled to controlling weight when 'no medical

opinion in evidence contradicts a doctor's retrospective diagnosis finding a disability'") (quoting Rivera v. Sullivan, 923 F.2d 964, 968 (2d Cir. 1991)) (internal brackets omitted)).

Because an "ALJ generally has an affirmative obligation to develop the administrative record," "even when the claimant is represented by counsel[,]" Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996), the ALJ cannot reject a treating physician's diagnosis "without first attempting to fill any clear gaps in the administrative record." Rosa, 168 F.3d at 79. The applicable regulations require the SSA to "seek additional evidence or clarification" from treating sources whose reports "contain[ ] a conflict or ambiguity that must be resolved" or are "inadequate for [the Commissioner] to determine whether [the claimant] is disabled. 20 C.F.R. § 404.1512(e).

**B.   Dr. Moss' Report**

At the SSA's request, Dr. Moss completed a form titled, "Headaches Residual Functional Capacity Questionnaire", and which is signed and dated May 13, 2009. See T.341-46. Dr. Moss indicated that Plaintiff's diagnoses include migraines, depression, and anxiety. T.341. The nature, location, and intensity/severity of Plaintiff's headaches were characterized as "variable, sometimes disabling [with] [Plaintiff] required to lie in dark room." Id. Associated with the headaches, Plaintiff experienced photosensitivity, mood changes, mental confusion, and inability to

concentrate. T.342. The headaches occurred about 2 to 3 times per week and lasted 6 to 48 hours. Id. Headache triggers were bright lights, noise, and stress; the headaches were worsened by bright lights and noise, and were ameliorated by lying in a darkened room. T.341-42.

Dr. Moss stated that Plaintiff was not a malingerer, and that emotional factors "somewhat" contributed to the severity of her migraines. When asked if Plaintiff's impairments were "reasonably consistent" with the symptoms and functional limitations described in the report, Dr. Moss responded, "yes." T.343. During the times that Plaintiff had a "severe" headache, she would be precluded from performing even basic work activities. T.344. Dr. Moss opined that Plaintiff would "rarely" need to take unscheduled breaks during the work-day, but if she did, she would have to sit quietly or lie down. T.345. Dr. Moss stated that her migraines would produce "good days" and "bad days", and that as a result of the migraines, Plaintiff likely would be absent from work about once a month. T.345.

In his decision, the ALJ gave no weight to Dr. Moss's medical source statement, signed May 13, 2009, or Dr. Howard's Physical Residual Functional Capacity Questionnaire signed February 9, 2010, because the ALJ concluded that they both addressed periods after the date last insured. Plaintiff notes that Dr. Howard's report, describing her pain symptoms and resultant limitations, clearly

indicates that these problems have been present for two years. See T.370 ("How long has patient been limited as indicated above? 2 yrs.").[2]

However, as Plaintiff points out, unlike Dr. Howard's report, Dr. Moss' opinion gives no such time restriction. Significantly, medical records from Dr. Moss show that she has been treating Plaintiff for migraine headaches since at least June 12, 2006. T.335-36. At that time, Dr. Moss noted that Plaintiff had been started on Neurontin for her headaches, that the dose had been increased, but that "the headaches have gradually increased in frequency again." Id. Thus, it is possible that Dr. Moss's report applies to the relevant time-period, since Plaintiff was seeing Dr. Moss regularly during that time.

Despite the fact that Dr. Howard's report contains a specific indication as to the dates it covered, and Dr. Moss's report does not, the ALJ treated Dr. Howard's and Dr. Moss's reports as equivalent, stating

> [s]imilarly, an opinion from Dr. Moss dated May 13, 2009 is accorded no weight because it does not address the period pertaining to this decision. In her report, Dr. Moss makes no reference to the duration of the limitations or when they began to be at the severity she opines.

T.28. The ALJ made no allowance for the fact that the form completed by Dr. Howard included a question asking specifically for

---

[2]
Plaintiff does not argue in her motion for judgment on the pleadings that the ALJ's failure to assign weight to Dr. Howard's report was erroneous.

the duration of Plaintiff's limitations; the form completed by
Dr. Moss contained no such question. The Court finds that it is
illogical to, on the one hand, find Dr. Howard's report to be time-
limited because it specifically says that it is, and then, on the
other hand, find Dr. Moss's report to be time-limited because it is
silent as to what period of time it covers.

There is no question that Dr. Moss, a neurologist who has
treated Plaintiff since June 2006, is a "treating source" under the
regulations. See 20 C.F.R. § 404.1502 ("[t]reating source means
your own physician, psychologist, or other acceptable medical
source"); 20 C.F.R. § 404.1513(a) (defining an acceptable medical
source as licensed physicians and psychologists; licensed
optometrists, podiatrists, and speech-language pathologists also
can be acceptable medical sources, but only to establish specific
impairments). "[a]n ALJ is required to give controlling weight to
the medical opinion of a claimant's treating physician when that
opinion: (1) concerns the nature and severity of an impairment;
(2) is well-supported by medically acceptable clinical and
laboratory diagnostic techniques; and (3) is not inconsistent with
other substantial evidence in the case record." Meadors v. Astrue,
370 F. App'x 179, 182 (2d Cir. 2010) (unpublished opn.) (citing 20
C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Schisler v. Sullivan,
3 F.3d 563, 567 (2d Cir. 1993)). Where a treating source's opinion
is not given controlling weight, the proper weight accorded by the

ALJ depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Clark v. Commissioner of Social Sec., 143 F.3d 115, 118 (2d Cir. 1998); see 20 C.F.R. § 404.1527(c)(2). A corollary to the treating physician rule is the so-called "good reasons rule," which provides that the SSA "will always give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion." Clark, 143 F.3d at 118 (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); alterations in Clark). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Blakely v. Commissioner of Social Sec., 581 F.3d 399, 406 (6th Cir. 2009) (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). Because the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process," Rogers v. Commissioner of Social Sec., 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given

'*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record.'" <u>Blakely</u>, 581 F.3d at 407 (quoting <u>Rogers</u>, 486 F.3d at 243; emphasis in <u>Blakely</u>).

Here, as explained above, the only reason the ALJ provided for discounting Dr. Moss's report was that Dr. Moss's report *did not* contain a specific indication as to the dates it covered. Therefore, he concluded, it could not have covered the period of disability in question. However, the ALJ also rejected Dr. Howard's report–which *did* contain a specific indication as to the dates it covered–for the *same reason*, and concluded that Dr. Howard's report did not apply to the alleged period of disability. The ALJ's reason for rejecting Dr. Moss's report is not only arbitrary and speculative, it creates an internal inconsistency in his decision. Accordingly, it cannot be a "good reason" for rejecting Dr. Moss's report.

After reviewing the record, the Court concludes that there is no reason for Dr. Moss's opinion not to be given controlling weight. Dr. Moss, a specialist in neurology, had a treating relationship with Plaintiff during the period at issue. Her opinion is supported by substantial evidence and is consistent with Plaintiff's medical record as a whole. In particular, the Court notes that throughout the period at issue, Plaintiff consistently was experiencing at least 2 migraine headaches per week. For instance, in December 2004, Plaintiff saw neurologist Dr. Maroldo

-23-

and reported almost-daily occurrences of migraine headaches and dizziness; the episodes could last up to 8 or 9 hours. T.601; see also T.608-09. Dr. Maroldo prescribed Imitrex as a headache-abortive agent, and throughout the period of alleged disability, Plaintiff was taking it 3 to 4 times per week. E.g., T.206-07; 310. Imitrex caused significant side-effects, namely, extreme drowsiness; Plaintiff reported that she would fall asleep after taking it. T.608. The medical evidence of record thus supports Dr. Moss' opinion that during the times that Plaintiff had a "severe" headache, she would be precluded from performing even basic work activities, that Plaintiff's migraines would produce "good days" and "bad days", and that as a result of the migraines, Plaintiff likely would be absent from work about once a month. T.344-45. Indeed, based upon the frequency with which Plaintiff's symptoms necessitated the use of the sleep-inducing drug, Imitrex, it would seem that Dr. Moss' prediction of only one missed day of work per month is overly optimistic. As Dr. Moss acknowledged, during the times that Plaintiff had a "severe" headache, she would be precluded from performing even basic work activities. T.344. The medical record indicates that Plaintiff was having headaches severe enough to require her to take Imitrex between 3 and 4 times a week. Even if she had only 1 "severe" headache a week, she still would miss 4 days of work per month, which vocational experts agree precludes substantial gainful employment. See, e.g., Serrano v.

-24-

Colvin, No. 12 Civ. 7485(PGG)(JLC), 2014 WL 197677, at *5 (S.D.N.Y. Jan. 17, 2014) (vocational expert testified that should hypothetical claimant's mental impairment cause him to be absent two or more times per month, employment would be precluded; employability would also be affected should this individual have to take several additional unscheduled breaks due to panic attacks); Gallagher v. Astrue, No. 10 Civ. 8338(LTS)(AJP), 2012 WL 987505, at *9 (S.D.N.Y. Mar. 22, 2012) (vocational expert testified that hypothetical claimant would not be able to sustain employment if he were absent from work for three days a month due to his symptoms or if he were frequently off-task), report and recommendation adopted, 2012 WL 1339357 (S.D.N.Y. Apr. 17, 2012).

Where, as here, the reviewing court concludes that incorrect legal standards have been applied and that substantial evidence does not support the Commissioner's determination on disability, it should be reversed. 42 U.S.C. § 405(g). The court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if it is necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)). Reversal without remand is appropriate where, as in the present case, there is "persuasive proof of disability" in the record and further proceedings would be of no use. Id.; see also, e.g., Rivera, 923 F.2d at 970 ("[T]he record fails to reveal any evidence which could

support a finding that Rivera was capable of performing substantial gainful work which was available in the national economy."); <u>Manago v. Barnhart</u>, 321 F. Supp.2d 559, 570 (E.D.N.Y. 2004) (where the record contained "persuasive proof of total disability at least from March 14, 1990, and the rest of the factors, as determined by the ALJ, favor a finding of disability", a remand for further evidentiary proceedings would serve no purpose; finding that an "[e]ntry of a judgment of disability and remand for calculation of benefits is appropriate").

## VII. Conclusion

For the reasons discussed above, Defendant's motion for judgment on the pleadings is **denied**, and Plaintiff's motion for judgment on the pleadings is **granted**. The Commissioner's decision is reversed, and the matter is remanded to the Commissioner for calculation and payment of benefits.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    April 28, 2014
          Rochester, New York